# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

DEBORAH JANE BUCKNER,           )
                                )
            Plaintiff,          )
                                )        **Civil Action No. 2:02-0103**
        v.                      )        **Judge Wiseman / Knowles**
                                )
JO ANNE BARNHART,               )
Commissioner of Social Security )
                                )
            Defendant.          )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on cross-Motions for Judgment on the Administrative Record. Docket Entry Nos. 9 and 11.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

## I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on August 7, 1995, alleging that she had been disabled since July 31, 1995, due to a back problem, "leg drags," stomach pain, a mass in her right upper pelvis, a right kidney problem, and urinary incontinence.

Case 2:02-cv-00103   Document 16   Filed 02/02/06   Page 1 of 63 PageID #: 1

*See, e.g.,* Docket Entry No. 7, Attachment ("TR"), pp. 28; 43. Plaintiff's application was denied both initially (TR 27-28) and upon reconsideration (TR 42-43). Plaintiff subsequently requested (TR 56) and received (TR 566-591) a hearing. Plaintiff's hearing was conducted on February 25, 1997, by Administrative Law Judge ("ALJ") Robert C. Laws. TR 566-591. Plaintiff and Vocational Expert, Gordon Doss, appeared and testified. *Id.* Plaintiff's spouse, Jack Buckner, also testified at the hearing. TR 585.

On April 4, 1997, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 207-219. Specifically, the ALJ made the following findings of fact:

1. The claimant has not engaged in substantial activity since filing application for a period of disability, and disability insurance benefits on August 7, 1995.

2. The medial evidence establishes that the claimant has lumbar disc disease, with a history of undergoing back surgery; gynecological problems with a history of undergoing a total abdominal hysterectomy and salpingo oophorectomy, and urinary incontinence. The claimant is "severely" impaired, but she does not have an impairment or combination of impairments listed in, or medically equivalent to one listed in, Appendix 1, Subpart P, 20 C.F.R. Part 404.

3. The claimant does not experience pain, discomfort, or other symptoms with the severity, frequency, or duration necessary to preclude her from performing all substantial gainful activity on a regular and sustained basis as analyzed in light of the clinical and diagnostic findings and based on the applicable regulations discussed herein.

4. The claimant has the residual functional capacity for light and sedentary work with the following limitations: that the claimant be allowed a sit or stand option; that she not be required to perform over-the-head work; and no climbing or reaching (20 C.F.R. § 404.1545).

2

5.   The claimant is unable to perform her past relevant work as a licensed practical nurse.

6.   The claimant's residual functional capacity for performing the full range of light and sedentary work is reduced by the restrictions and limitations identified in Finding No. 4.

7.   The claimant is 48 years old, which is defined as a "younger individual" (20 C.F.R. § 404.1563).

8.   The claimant has in excess of a high school education (20 C.F.R. § 404.1564).

9.   The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work (20 C.F.R. § 404.1586).

10.  Based on an exertional capacity for light and sedentary work and the claimant's age, education, and work experience, 20 C.F.R. § 404.1569 and Rules 202.20 and 201.21, Table Nos. 2 and 1, of Appendix 2, Subpart P, 20 C.F.R. Part 404, would direct a conclusion of "not disabled."

11.  Although the claimant's additional nonexertional limitations do not allow her to perform the full range of light and sedentary work, using the above-cited rules as a framework for decisionmaking [*sic*] and the testimony of the vocational expert, there are a significant number of jobs in the national economy which she could perform. Examples of such jobs are: cashier and, [*sic*] sales clerk. There are approximately 13,900 such jobs in the region where the claimant lives and to a greater extent in the national economy.

12.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision [20 C.F.R. § 404.1520(f))] [*sic*].

TR 217-219.

On April 18, 1997, Plaintiff timely filed a request for review of the hearing decision. TR

220-222. On September 25, 1998, the Appeals Council remanded the case to an Administrative

3

Law Judge for a new hearing. TR 225-226. Plaintiff's second hearing was conducted on May

21, 1999, by Administrative Law Judge ("ALJ") John P. Garner. TR 545-565. Plaintiff and

Vocational Expert, Gina Klaus, appeared and testified. TR 560-564.

On July 22, 1999, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff

was not disabled within the meaning of the Social Security Act and Regulations. TR 306-318.

Specifically, the ALJ made the following findings of fact:

1. The claimant met the disability insured status requirements of the Act on July 31, 1995, the date the claimant stated she became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in any substantial gainful activity since July 31, 1995.

3. The medical evidence establishes that the claimant has "severe": degenerative disc disease of the lumbar spine with post-laminectomy changes at L5-S1, osteoarthritis, and status post total hysterectomy with salpingo and oophorectomy, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints, including pain, are not found to be persuasive to the extent alleged for the reasons discussed above.

5. The claimant has the residual functional capacity to perform a limited range of light work with a sit/stand option, occasional climbing, stooping, crouching, kneeling, no balancing, no reaching overhead, and no working at heights or with/around moving machinery (20 C.F.R. 404.1545).

6. The claimant is unable to perform her past relevant work as a licensed practical nurse, per vocational expert testimony.

7. The claimant's residual functional capacity for the full range of light work is reduced by the additional restrictions as indicated in Finding #5.

4

8.  The claimant is 50 years old, which is defined as closely approaching advanced age (20 C.F.R. 404.1563).

9.  The claimant has a high school education plus training as a licensed practical nurse (20 C.F.R. 404.1564).

10. In view of the claimant's age and residual functional capacity, the issue of transferability of skills is not material to the decision (20 C.F.R. 404.1568).

11. Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rules 202.14 / 202.15, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional nonexertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking [*sic*], there are a significant number of jobs in the national economy which she could perform. Examples and numbers of such jobs are: as cited above.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. 404.1520 (f)).

TR 316-317.

On October 19, 2000, the Appeals Council again remanded the case to an Administrative Law Judge for a third hearing.[1] TR 334-336. Plaintiff's third hearing was conducted on February 16, 2001, again by Administrative Law Judge ("ALJ") John P. Garner. TR 505-544. Plaintiff and Vocational Expert, Lisa Courtney, appeared and testified. TR 508-544. Plaintiff's spouse, Jack Buckner, also testified at the hearing. TR 536-537.

On August 24, 2001, the ALJ issued a decision unfavorable to Plaintiff, finding that

---

[1]It is unclear from the record whether the Plaintiff filed a request for review of the second hearing decision.

Case 2:02-cv-00103   Document 16   Filed 02/02/06   Page 5 of 63 PageID #: 5

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 11-20. The ALJ made findings of fact identical to those in the July 22, 1999 decision, with the exception of the following changes or additions:

> 1. The claimant met the disability insured status requirements of the Act on July 31, 1995, the date the claimant stated she became unable to work, and continues to meet them through December 31, 1999.

> 3. The medical evidence establishes that the claimant had "severe": degenerative disc disease of the lumbar spine with post-laminectomy changes at L5-S1, osteoarthritis, and status post total hysterectomy with salpingo and oophorectomy, depression, anxiety, and a somatization disorder, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

> 5. The claimant had the combined residual functional capacity to perform a limited range of light, unskilled work with a sit/stand option, occasional climbing, stooping, crouching, kneeling, no balancing, no reaching overhead, and no working at heights or with/around moving machinery (20 C.F.R. 404.1545).

> 7. The claimant is currently 52 years old, which is defined as closely approaching advanced age. She was 51 at her date last insured (20 C.F.R. 404.1563).

> 10. She has no transferable skills to the combined residual functional capacity assigned (20 C.F.R. 404.1586).

TR 19-20.

On September 10, 2001, Plaintiff timely filed a request for review of the third hearing decision. TR 10. On October 22, 2002, the Appeals Council issued a letter declining to review the case (TR 5-6), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42

U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to a back problem, leg drags, stomach pain, a mass in her right upper pelvis, a right kidney problem, and arthritis. TR 28. Plaintiff has additionally alleged status post total hysterectomy with salpingo oophorectomy, depression, anxiety, and somatization disorder, as well as incontinence. TR 19; 218.

### 1. Evidence Presented at Plaintiff's February 25, 1997 Hearing[2]

The evidence of record indicates that Plaintiff had been under the care of Dr. Robert Baker since at least July 17, 1995, for complaints of chronic arthritic pains in her hands, lower spine, hips, and feet. TR 94. X-rays taken in 1995 of Plaintiff's spine, hips, and pelvis showed degenerative changes, and x-rays of her hands and feet revealed degenerative osteoarthritis. *Id.* Magnetic Resonance Imaging ("MRI") testing performed on July 20, 1995, showed findings consistent with "central canal stenosis involving the L3-4 and 4-5 levels," and also showed "paracentral disc herniation at L5-S1." TR 101. The MRI also showed a "high signal intensity mass in the right upper pelvis." *Id.* At the suggestion of Plaintiff's neurosurgeon, Dr. William R. Schooley, back surgery was deferred until Plaintiff's pelvic mass was treated. TR 158.

Plaintiff was operated on by Dr. Michael Pippin, who performed a total abdominal hysterectomy and bilateral salpingo-oophorectomy on August 21, 1995. TR 117. The

---

[2] This discussion excludes pages 166-167 of the record which are illegible, but appear to be a partial list of Plaintiff's medical visits to the doctors and hospitals discussed in this section.

Case 2:02-cv-00103   Document 16   Filed 02/02/06   Page 7 of 63 PageID #: 7

Cookeville Pathology Laboratory examined Plaintiff's pelvic mass after it was removed and determined that it was a benign cyst. TR 119. Plaintiff did not require hormone therapy until a short time after her subsequent back surgery. TR 153.

On October 17, 1995, following her abdominal surgery, Plaintiff was hospitalized for back surgery at the St. Thomas Hospital in Nashville, Tennessee. TR 127. Dr. Schooley performed Plaintiff's semihemilaminectomy and diskectomy. *Id*. Plaintiff's intraoperative and postoperative courses were uneventful; she was ambulating and voiding without difficulty the evening of her surgery and was ready for discharge on the first postoperative day. *Id*.

On November 3, 1995, Plaintiff returned to Dr. Pippin, complaining about having had urinary incontinence since her surgery. TR 153. Dr. Pippin was unsure of the cause of her incontinence, but suspected nerve irritation because of the back surgery. *Id*. At Dr. Pippin's suggestion, Plaintiff returned to Dr. Schooley on November 7, 1995. TR 159. Plaintiff indicated at this time that the pain in her right leg was resolved, and that although she still had some numbness in her right foot, she was happy with the results of her surgery. *Id*. Her chief complaint was urinary incontinence, which she did not have while in the hospital, but which started in the car on her way home. *Id*. Plaintiff reported that she had previously experienced urinary incontinence during her last pregnancy and when she had kidney stones. *Id*. Dr. Schooley noted that Plaintiff's MRI did not show any compressive lesion that would cause Plaintiff's incontinence and recommended that she see a urologist. *Id*. He also scheduled a repeat MRI of Plaintiff's lumbar spine. *Id*.

On November 14, 1995, Plaintiff returned to Dr. Schooley for the MRI of her spine. TR 160. The MRI revealed "post-laminectomy changes at L5-S1, with no evidence of recurrent disc

8

herniation" and "spondylosis at this level resulting in moderate lateral recess stenosis bilaterally." *Id.* Plaintiff's MRI further revealed "mild epidural fibrosis surrounding the right S1 nerve root" as well as "a combination of lumbar spondylosis and short pedicles resulting in mild central canal stenosis at the L-3 and L4-5 levels," and "abnormality ... not significantly changed since the previous exam." TR 161.

On November 21, 1995, Plaintiff visited the Upper Cumberland Urology Association for her incontinence, where she was seen by Dr. Lee S. Moore. TR 195; 201-202; 205. Dr. Moore suspected Plaintiff's incontinence was caused by "hyperreflexia" possibly related to Plaintiff's back surgery. TR 205. Dr. Moore prescribed Oxybutynin and asked Plaintiff to return in one month for a follow-up examination. *Id.* In a letter to Dr. Pippin, dated November 29, 1995, Dr. Moore indicated that he could not say with certainty whether Plaintiff's hyperreflexia was related to her back surgery. TR 199.

On November 22, 1995, Plaintiff saw Dr. Gary Militana for a Renal Impression, the results of which were unremarkable. TR 196.

Plaintiff returned to Dr. Moore for her follow-up examination on December 18, 1995. TR 205. Dr. Moore determined that Plaintiff was improving and adjusted her medication to see if that would help further. *Id.* Dr. Moore again examined Plaintiff on May 2, 1996 for another follow-up visit. TR 206. Plaintiff complained of having incontinence that was especially aggravated by car rides. *Id.* Dr. Moore performed a stress test which was "negative in both the upright and supine positions," noted that Plaintiff's bladder "seemed to be up nicely and anterior," and reported that it "did not leak whatsoever" in the upright position. *Id.* Dr. Moore observed that Plaintiff had become resistant to the effects of Oxybutynin. *Id.* On May 14, 1996,

9

Dr. Moore noted that Dr. Baker had changed quite a bit of Plaintiff's medication and was not sure which one was helping her, but he noted that the medication seemed to have helped her bladder and bowel problems quite a bit. *Id.*

Throughout this period, Plaintiff continued to see Dr. Baker, who examined her prior to and after her surgeries. TR 182-194. On December 8, 1995, Dr. Baker examined Plaintiff and noted that Plaintiff had been having trouble with urinary incontinence and had visited Dr. Moore for the problem. TR 184. On March 28, 1996, Plaintiff again visited Dr. Baker, complaining of "generalized arthralgias which [was] worse in her knees, shoulders, and hands." *Id.* Dr. Baker noted that Plaintiff was able to ambulate, and that there were "arthritic changes of the hands, no swelling over the knees or shoulders or other joints." *Id.* On an April 11, 1996 visit, Plaintiff reported that her arthritic pain was improved with Voltaren and that her leg cramps were being controlled with Quinamm. TR 183. Later that month, Plaintiff applied to the State of Tennessee Department of Safety Titling and Registration Division for a disabled person license plate. TR 163.

On May 3, 1996, Plaintiff returned to Dr. Baker, stating, "I just feel bad," and adding that her whole life had changed and that she did not sleep well at night. TR 183. Plaintiff stated that she did not know whether she was depressed, and she denied any suicidal ideation. *Id.* Dr. Baker prescribed Zoloft, an antidepressant. *Id.* On May 28, 1996, Dr. Baker wrote a letter, which was added to Plaintiff's disability file, that indicated that "due to her chronic low back pain and polyarthralgias [Plaintiff] is unable to perform her job as a nurse and her condition is unlikely to improve." TR 165. On June 14, 1996, Plaintiff reported feeling "much better" on the Zoloft. TR 183. On September 16, 1996, Plaintiff reported that she was feeling "much better,"

10

her depression was "controlled with Zoloft," and that she had no further complaints that day.  TR 182.

On November 27, 1996, Dr. George Z. Seiters conducted a consultative evaluation of Plaintiff and completed a Medical Source Statement To Do Work-Related Activities form.  TR 171-178.  Dr. Seiters noted that Plaintiff's medical records suggested that she had improved after her surgery but that she did have some complaints of residual numbness and urinary incontinence.  TR 171.  He further noted that Plaintiff reported "overall she felt unimproved and continued to experience back and radiating right leg pain with weakness in the right ankle," and that post-operatively she was unable to resume work activity.  *Id*.  He also indicated that Plaintiff "describe[d] long standing arthritis in both shoulders" and "a five year history of pain index finger and thumb diagnosed as osteoarthritis with x-rays showing osteoarthritis in the hands." *Id*.  Dr. Seiters also wrote that "there is no muscle atrophy in hands ... no wrist or elbow tenderness, inflammatory change or swelling, and range of motion of the wrist and elbow is full."  TR  172.  He noted that "a left foot examination show[ed] a small, slightly inflamed bunion with mild hallux valgus" with "no hammertoe noted."  TR 175.  Dr. Seiters' impression after the evaluation was that Plaintiff had "AC joint arthritis, both shoulders"; "osteoarthritis both hands"; a "herniated disc L5-S1, status post surgical intervention with residual symptoms"; and "degenerative disc disease with facet joint arthritis with spinal stenosis 3-4, 4-5, and 5-1." *Id*.

On the Medical Source Statement To Do Work Related Activities form, Dr. Seiters indicated that Plaintiff's "lifting/carrying" was affected by impairment because of disc surgery and residual symptoms, and that Plaintiff could occasionally lift and/or carry up to 20-50 pounds

and frequently lift and/or carry up to 10-20 pounds.  TR 176.  Dr. Seiters also indicated that

Plaintiff could walk for a total of 2-4 hours in an 8-hour workday, and walk without interruption

for half an hour to one hour a day.  *Id*.  Dr. Seiters further indicated that Plaintiff could sit for 4-6

hours total in an 8-hour workday and sit without interruption for 2 hours.  TR 177.  Dr. Seiters

reported that Plaintiff could occasionally climb, stoop, crouch, and kneel; that she could "never"

balance; that her ability to reach was impaired, but that her handling, feeling, pushing/pulling,

seeing, hearing, and speaking were not; and that she had environmental restrictions for heights

and moving machinery, but not for temperature extremes, chemicals, dust, noise, fumes,

humidity, vibration, or "other."  TR 177.  The form also provides, "State any other work-related

activities which are affected by the impairment, and indicate how the activities are affected.

What are the medical findings that support this assessment?"  TR 178.  In response, Dr. Seiters

wrote, "limit bending," "limit overhead reaching [with] both shoulders."  *Id.*

**2.  Evidence Presented at Plaintiff's May 21, 1999 Hearing**

The Administrative Law Judge at Plaintiff's second hearing considered the evidence

discussed above, as well as new evidence presented by Plaintiff.  TR 310-318.

Plaintiff continued to visit Dr. Baker in 1996 and 1997.  TR 229-236.[3]  On March 12,

1997, Plaintiff underwent a "PA and lateral chest" exam, but the results were unclear and a repeat

exam was conducted by radiologist Dr. Steven B. Knight on April 9, 1997, at the White County

Hospital.  TR 231; 236.  Dr. Knight also conducted a cervical spine exam at that time.  TR 236.

Dr. Knight's impressions were that there was "no evidence of acute cardiopulmonary disease"

and "no significant change from the previous study, pectus carinatum deformity of the sternum,

---

[3]  Pages 229 and 232 of the record are mostly illegible.

Case 2:02-cv-00103   Document 16   Filed 02/02/06   Page 12 of 63 PageID #: 12

no evidence of acute fracture or mal-alignment of the C-spine." TR 236. Dr. Knight noted, however, that "the retropharyngeal soft tissues were excluded from the lateral view," and he suggested that, if clinically indicated, this could be repeated for further evaluation. *Id.*

Plaintiff was treated by Dr. John Thompson from April 10-25, 1997. TR 237-243.[4] A CT scan of Plaintiff's right shoulder and upper thorax performed by Dr. Knight on April 10, 1997, revealed "mild degenerative changes" in the right "AC" joint, and showed that there was a "mass in the posterior right peritracheal region at the C7-T1 level." TR 242-243.[5] A neck MRI was recommended for further evaluation. *Id.*

On April 15, 1997, Plaintiff underwent an MRI of the cervical spine at the Cookeville General Hospital. TR 241. Plaintiff's MRI revealed a disc bulge that did not appear to produce any neural involvement. *Id.* There was no evidence of frank disc herniation or spinal stenosis and the cervical cord was intact. *Id.*

On April 25, 1997, a thyroid ultrasound, performed by Dr. Militana, revealed Plaintiff's thyroid gland to be "normal in size," but there was a small "solid mass within the inferior posterior aspect of the right lobe of the thyroid gland." TR 240. Dr. Militana noted that "[t]hyroid CA cannot be ruled out at this time." *Id.*

From April 28, 1997 to March 4, 1999, Plaintiff continued to see Dr. Baker. TR 355-361. On April 28, 1997, Plaintiff saw Dr. Baker for severe pain in the right medial clavicular area. TR 261. Dr. Baker noted that the radiologist did not believe this pain was related to the mass in Plaintiff's thyroid. *Id.* A report from Dr. Daniel H. Donovan on April 30, 1997, indicated that

------

[4] TR 238-239 are generally illegible.

[5] During this scan, Plaintiff was monitored briefly in the Emergency Room when she developed a reaction to the contrast. TR 291-292.

Plaintiff underwent an "EMG" study of her right upper extremity, the results of which were normal. TR 269. There was no evidence for a radiculopathy or peripheral neuropathic disturbance. *Id.*

On May 5, 1997, Dr. Baker noted that there was increased activity over the left renal outline which could be caused by an obstructed left upper collecting system. TR 261. An abdominal ultrasound performed on May 6, 1997, by Dr. John Molin revealed "kidneys of normal size without masses or evidence of obstruction," although the lower pole of the left kidney was not well visualized. TR 261; 267.

On May 7, 1997, Dr. Baker noted that a bone scan performed on May 1, 1997 by Dr. Militana revealed "focal hot areas of accumulation of the isotope involving the right AC and sternoclavicular joints." TR 261; 268. A May 23, 1997 thyroid uptake and scan indicated that Plaintiff's "24 hour thyroid uptake was 7%, at the lower limits of normal," and that there was a "1.5cm mass on the right lobe of Plaintiff's thyroid." TR 266. On May 27, 1997, Plaintiff was found to have a cold nodule on her thyroid. TR 260. On May 30, 1997, a fine needle aspiration of Plaintiff's right thyroid lobe performed by Dr. Charles E. Jordan revealed "occasional inflammatory cells and blood," but no "malignant cells," according to the Cookeville Pathology Laboratory. TR 277-79.

On June 16, 1997, Plaintiff saw Dr. Baker, who noted that Plaintiff was complaining of "right medial shoulder pain without improvement," but that the biopsy of her thyroid was negative. TR 260. On July 2, 1997, Plaintiff saw Dr. Robert E. Clendenin III, who indicated that Plaintiff was "able to abduct her arm to 90-100 degrees actively, and full motion passively, although somewhat painful." TR 280-281. Dr. Clendenin also stated that Plaintiff had "synovitis

14

in the right sternoclavicular joint with diffuse cervicalgia and myofascial pain syndrome and right

shoulder tendinitis," which he thought were related to her underlying depression and lack of

sleep. *Id*. On July 22, 1997, Plaintiff returned to Dr. Baker's office with a rash that was a

reaction to the thyroid dye. TR 260. On July 29, 1997, Plaintiff returned for a follow-up, where

she complained of feet swelling, rash, and lower back pain. TR 259. Dr. Baker noted that

Plaintiff had spondylosis and arthritis, as well as a benign goiter. *Id*. On August 19, 1997,

Plaintiff returned to Dr. Clendenin, who discussed with her the possibility of referring her to

surgery for her ongoing sternoclavicular pain, but she did not want to pursue this option at that

time. TR 282.

On October 1, 1997, Plaintiff returned to Dr. Baker, complaining of pain in her left ankle

and knee, which was swollen and red. TR 259. Dr. Baker noted that her arthralgias could be a

result of Plaintiff's underlying Sjorgen's Syndrome.[6] *Id*. At her October 8, 1997 visit, Plaintiff

stated that her knee felt "much better." TR 258. On October 14, 1997, Plaintiff returned to Dr.

Clendenin, who noted that Plaintiff reported sleeping "much better" and that her major complaint

continued to be right anterior shoulder pain with loss of motion. TR 283.

On her November 3, 1997 visit to Dr. Baker, Plaintiff complained of redness, pain and

swelling of both feet and her right calf. TR 258. Dr. Baker noted that Plaintiff might have

"recurrent herpetic infections with erythema multiform" and advised right leg elevation and warm

soaks. *Id*. On November 5, 1997, Plaintiff complained of back pain, nausea, and swelling of the

lower extremities. *Id*.

On November 11, 1997, a "Duplex Venogram BLE," performed by Dr. Militana, revealed

---

[6]The record does not indicate when Plaintiff was diagnosed with Sjorgen's Syndrome.

"normal spontaneous and augmented doppler flow, no evidence for intraluminal clot formation with good compressibility of the deep venous systems from the proximal left femorals distal to the trifurcations of the popliteal veins." TR 265. Dr. Militana noted two "1cm" lymph nodes in the left inguinal region. *Id*. On November 19, 1997, Plaintiff stated that the swelling in her legs was "much better," although her feet were somewhat red and itchy. TR 257.

On December 9, 1997, Plaintiff reported that the rash on her legs was better. TR 257. On March 17, 1998, Plaintiff reported that she was feeling about the same, with complaints of chronic arthralgias and back pain. *Id*. On July 14, 1998, Plaintiff returned to Dr. Baker with no complaints, just needing refills on all her medications. TR 256. On March 4, 1999, Plaintiff once again returned to Dr. Baker for refills of her medications. TR 255.

### 3. Evidence Presented at Plaintiff's February 16, 2001 Hearing

ALJ John Garner presided over Plaintiff's third hearing as well, and thus was familiar with the evidence presented at the first two hearings. TR 14-20. The evidence presented at the third hearing indicated that Plaintiff was suffering from mental as well as physical ailments. TR 337-476.

On February 21, 2000, Plaintiff was sent to the White County Community Hospital Emergency Room ("ER") by Dr. Baker because she told him she was having suicidal thoughts and had been taking overdoses of some over-the-counter medications that made her sleep for 2-3 days. TR 370-379. Plaintiff had written a suicide note, asking for help and admitting to suicidal ideation. TR 379. The note stated: "I can't take it any longer." TR 374. Upon arrival at the ER, Plaintiff was emotional, but denied suicidal ideation at that time. TR 370. Plaintiff stated, "sometimes I just want to take some pills and check out for a little while," and she added that, "I

16

don't want to die." *Id.* Plaintiff was discharged from the ER to her husband's care and agreed to go to University Medical Center/McFarland ("UMC") in Lebanon, Tennessee for voluntary commitment. TR 375.

After leaving the ER on February 21, 2000, Plaintiff was admitted to UMC. TR 341. Upon admission, Plaintiff reported that she was going into a deep depression; that she felt helpless, hopeless and worthless; that she was not sleeping or eating; that she had been having crying spells; that she was unable to relax; and that she felt that life was "not worth living." *Id.* Plaintiff denied any previous psychiatric hospitalizations and stated that her depression had started in 1990 as a result of various family problems, but got worse after her back injury in 1995. *Id.* Plaintiff reported that she began taking Zoloft after her 1995 back injury and that the Zoloft had helped her until December 1999, when her depression started getting worse. *Id.* Plaintiff further reported that she had never tried to kill herself, but was "taking excessive medication to avoid the whole world." *Id.* She also reported that she had worked all her life and that she wanted to continue doing so, but was unable to. *Id.*

General Psychiatry Activity notes from Plaintiff's stay at UMC indicated that Plaintiff was able to attend and participate in group support sessions. TR 348-360. The facilitator noted that Plaintiff at times appeared "flat," tearful, or depressed. TR 351; 354; 357. In a February 22, 2000 session, Plaintiff stated that she was very frustrated over her medical conditions, that she had incontinence of her bladder and bowels since her back surgery, and that she sometimes saw shadows that were not there or heard the telephone ringing when it was not. TR 354. On February 23, 2000, Plaintiff reported feeling "better" but remained concerned about her incontinence. TR 355-356. On February 25, 2000, Plaintiff was discharged from UMC, and the

17

facilitator noted that she appeared bright and was interacting with the staff and her peers. TR 358. The discharge report summarizing her stay indicated that Plaintiff had initially experienced difficulty verbalizing her feelings and felt that her life was not worth living since she could not work. TR 339. After several days, however, Plaintiff reported that she was feeling "better," that she realized that her life was not as bad as others' lives, and that she did not have any suicidal ideation. *Id*. The discharge diagnosis was: "major depression, recurrent, severe, without psychotic features." *Id*. Plaintiff's Global Assessment of Functioning ("GAF") upon admission was 20, and had increased to 50 at the time of her discharge. TR 340. Upon her discharge, Plaintiff was provided with work simplification/energy conservation materials, as well as arthritis exercises. TR 358. Plaintiff acknowledged understanding of this material. *Id*. Plaintiff was scheduled for a follow-up with Dr. Sabitha Hudak and Dr. Carole Lovell, Psy.D., of the Personal Growth and Learning Center in Cookeville. TR 340.

On March 28, 2000, Plaintiff began treatment at the Personal Growth and Learning Center. TR 361-365. In a treatment plan created that day, Plaintiff was found to have a GAF of 55, with a highest GAF in the past year of 60. TR 361. In a psychiatric evaluation dated April 25, 2000, Plaintiff was found to have a then-current GAF of 50, with a highest GAF in the past year of 60. TR 405. A Progress Note from the Personal Growth and Learning Center on June 20, 2000 indicated that Plaintiff had been temporarily unable to attend their partial program because of insurance problems, and was instead admitted to Centennial Medical Center on April 28, 2000. TR 406; 380. Plaintiff was discharged from Centennial Medical Center on May 3, 2000. TR 380. The Progress Note indicated that Plaintiff reported that she was feeling "better," but still had some depression and anxiety, and that she was unable to sleep without medication.

TR 406.  The Progress Note further indicated that Plaintiff was eating and concentrating "better," was cooperative, and was not as "down."  *Id*.  Records from the Personal Growth and Learning Center on August 15, 2000 indicated that Plaintiff stated that her depression was "much better," and her sleep was also "better."  TR 401.

Plaintiff's attorney submitted office records from Dr. Bert Geer dated August 2000 to September 2000.  TR 386-397.  Plaintiff was referred to Dr. Geer by Dr. Baker for her "fairly long history of urinary incontinence and bladder spasms."  TR 390.  On August 14, 2000, Plaintiff stated that her incontinence was "driving her crazy."  *Id*.  Dr. Geer examined Plaintiff's abdomen and pelvis, revealing a greater than 30 degree deviation of the UV angle on Valsalva,  a Grade II cystocele with bilateral paravaginal defects, and a Grade II rectocele.  *Id*.  An office note, dated September 15, 2000, revealed that on urodynamic testing, Plaintiff was able to hold a fairly large amount of fluid.  TR 389.  Dr. Geer opined that Plaintiff had stress urinary incontinence, with perhaps a very small component of neurogenic bladder and a paravaginal defect that could potentially be corrected by surgery.  *Id*.  A note from September 26, 2000 indicated that Plaintiff had a large capacity bladder.  TR 388.  Dr. Geer noted that Plaintiff had stopped taking her Detrol because of the negative side effects, which were exacerbated by her Sjogren's syndrome.  *Id*.  Dr. Geer reaffirmed that Plaintiff could undergo surgery, although he could not guarantee the result.  *Id*.  Plaintiff indicated that she did not want to undergo any further surgery at that time.  *Id*.

A treatment plan dated September 19, 2000, from the Personal Growth and Learning Center indicated that Plaintiff had previously stopped attending the group sessions because of illness, but had now resumed the sessions, and that she had reported feeling unworthy because of

19

her incontinence and her inability to work.  TR 434.  The treatment plan advised continuing the group process for 31 additional weeks and strengthening Plaintiff's overall life skills and ability to cope with painful issues.  *Id*.  Records from this time through November 22, 2000, indicated that Plaintiff felt grateful to be part of the group and that the sessions seemed beneficial to Plaintiff.  TR 434, 431, 425.  Plaintiff did not mention her incontinence during an October 10, 2000, session, but had to leave the group session on October 17, 2000, because she had previously lost control of her bowels in the shower, and a discussion of showers by the group upset her.  TR 423.

Additional records from the Personal Growth and Learning Center, dated November 28 2000, to February 20, 2001, were submitted by Plaintiff's attorney.  TR 465-476.  These records indicated that, from November 2000 to January 2001, Plaintiff was mainly concerned about improving her skills in communicating with others.  TR 472; 475.  A group note dated December 12, 2000, indicated that Plaintiff's appearance, behavior, mood/affect, and cognitions were all within normal limits.  TR 471.   Plaintiff reported that her depression was "better" on December 15, 2000, that she was taking her medications as prescribed, and that she was "getting a lot from [the] group experience."  TR 469.

Dr. Baker, Plaintiff's primary care physician, submitted a letter dated December 5, 2000.  TR 452.  Dr. Baker opined that Plaintiff was totally disabled as a result of her urinary incontinence and depression, and noted that she had been unable to find work for the past five years as a result.  *Id*.  He further indicated that Plaintiff's condition was embarrassing to her, that she had tried every reasonable method to abate the problem and cure it, and that all attempts at abatement had been unsuccessful.  *Id*.  He added that he had seen her become so severely

20

depressed that she required immediate hospitalization with suicidal ideation. *Id*.

On January 8, 2001, Plaintiff underwent outpatient foot surgery for a moderately severe Hallux Valgus deformity of the left great toe with a cock-up deformity of the second toe. TR 446; 448-449. On a follow-up visit, after the modified McBride bunionectomy and extensor tenotomy of the left foot procedure, Plaintiff reported that she was doing "well," with no complaints. TR 447. The surgical incisions were clean and well-healed; the sutures were removed; there was no evidence of any infection; and there was minimal swelling about the foot. *Id*.

January 22, 2001, records from the Personal Growth and Learning Center indicated that Plaintiff was experiencing depression after her foot surgery, but that she was doing "OK in recovery" and hoped to find a ride to group sessions in the six weeks post-surgery, during which time she was unable to drive. TR 467. Plaintiff indicated that she dreaded "going to court" because she felt that the judge had been verbally abusive before.[7] *Id*. A February 20, 2001 progress note indicated that Plaintiff reported that she had relapsed into depression after surgery, but that she was using her skills to get better. TR 466. Plaintiff stated that she had been present at the Social Security hearing, and that the vocational "counselor" had said she could do security or assembly line work. TR 466. She stated that she missed group therapy, that she hoped to return the following week, and that she had been reading and doing crossword puzzles to help pass the time. *Id*.

An initial psychiatric evaluation from Dr. Badshah Maitra dated January 19, 2001, indicated that Plaintiff was referred by Carole Lovell of the Personal Growth and Learning

_____

[7]The reference to "going to court" is unclear, but it may refer to Plaintiff's third hearing, which occurred approximately one month later.

Center. TR 454-455. Plaintiff's mental status examination revealed that Plaintiff was anxious and had a depressed mood with a congruent affect. TR 455. Plaintiff denied any suicidal thoughts with any plans or intent, denied experiencing any auditory or visual hallucinations, and denied experiencing episodes of derealization or depersonalization. *Id*. Dr. Maitra noted that Plaintiff's insight and judgment seemed to be "quite adequate for daily living" although "quite impaired by her excessive somatization and negativity." *Id*. Dr. Maitra's diagnoses were "major depression, severe, without psychotic features, generalized anxiety disorder, and a somatization disorder not otherwise specified." *Id*. Dr. Maitra assigned Plaintiff a GAF of 50 to 55, and indicated that Plaintiff's best GAF in the last year was "probably much higher." *Id*. Dr. Maitra increased Plaintiff's Neurontin, told her to continue taking her Zoloft and all other medication prescribed by her primary care physician (Dr. Baker), to continue counseling with Carole Lovell on a regular basis, and to return in about two months. *Id*.

Throughout 1999 to 2001, Dr. Baker continued to monitor Plaintiff's progress. TR 487-503. On her September 15, 1999, and October 15, 1999, visits, Plaintiff's chief complaints were arthritis and incontinence. TR 497. Dr. Baker saw Plaintiff on February 21, 2000, and he sent her to the Emergency Room for severe depression. TR 496. On a March 15, 2000, visit, Plaintiff stated that she was less depressed, although she continued to complain of generalized arthritic pain. TR 495. On March 29, 2000, Plaintiff again stated that she was less depressed and stated that the pain she had been having in her foot was "much better." *Id*. On April 26, 2000, Plaintiff complained of insomnia, chronic pain in her legs, and urinary incontinence. TR 494. On August 7, 2000, Plaintiff complained of chronic generalized pain, although she stated that her depression was "better." TR 492. On October 9, 2000, Dr. Baker noted that Plaintiff

22

had been to see Dr. Geer for her chronic incontinence. TR 491. Dr. Baker also saw Plaintiff on January 10, 2001 after her foot surgery, and again on February 12, 2001, at which time she had no complaints. TR 490-491. On April 23, 2001, Dr. Baker saw Plaintiff, who again had no complaints. TR 498. On July 11, 2001, Plaintiff again visited Dr. Baker and stated that her medicine was not helping with her arthritis. *Id*.

## B. Testimony

### 1. Testimony from Plaintiff's February 25, 1997 Hearing

#### a. Plaintiff's Testimony

Plaintiff was born on October 31, 1948, has a twelfth grade education, and has LPN (Licensed Practical Nurse) training. TR 569-570. Plaintiff stated that she had been an LPN from 1970 until she became disabled on July 31, 1995. TR 570. She participated in all levels of patient care, performed the job walking and standing, with frequent bending and reaching, and engaged in heavy lifting when assisting patients. TR 570. Plaintiff testified that she stopped work because she could not walk down the hall, her feet dragged, and her hands hurt so badly that she could not open pills. TR 571. Plaintiff reported that she had suffered from arthritis since 1980, and that it became progressively worse. *Id*. She explained that she had tumors in her stomach which ruptured a disk in her back, which in turn pushed on a nerve in her leg, rendering her unable to walk. *Id*. Plaintiff stated that she first knew Dr. Baker through her work at a nursing home, and that she had been treated by him. *Id*. She recalled the first time Dr. Baker treated her as being some time in July 1995. *Id*. Plaintiff stated that she still saw Dr. Baker, and that the last time she had done so prior to the hearing was in November or December 1996. TR 572.

Plaintiff testified that she had also been seeing Dr. Moore since November of 1995, and that the last time she had seen him was in September of 1996.  TR 572.  Plaintiff explained that she had sought treatment from Dr. Moore because she became incontinent after her back surgery.  *Id.*  Plaintiff also testified that she had tumors removed in August 1995, which entailed a total hysterectomy and removal of endometriosis from her colon.  *Id.*  Plaintiff added that later that year, she had a diskectomy, which was her last surgical procedure to date.  TR 573.

Plaintiff indicated that she took all the medications listed on page two of Exhibit 20, which her attorney offered to the ALJ, and that she believed that the medicines helped her.[8]  TR 573.  Plaintiff reported that the only medicine which caused any side effects was the Propacet, which aggravated her incontinence because it caused her bladder to relax.  TR 574.  Plaintiff added that she nevertheless sometimes had to take the Propacet for her headaches and pain.  *Id.*  Plaintiff stated that she had pain associated with her problems, and that she "hurt all the time."  *Id.*  Plaintiff responded affirmatively when asked whether she felt this was one of the reasons why she could not work.  *Id.*  Plaintiff stated that she had constant pain in her shoulders, elbows, and feet, "a lot of" back pain with any movement, and a "a lot of pain" in her right shoulder.  *Id.*  She indicated that she was never pain free.  *Id.*

With regard to her daily activities, Plaintiff testified that she was able to take care of her own personal needs, including dressing and feeding herself, although she received help with anything that was difficult, such as pulling clothing over her head.  TR 575.  Plaintiff indicated that she could bathe herself and shower, but that she did not cook, do laundry, or grocery shop.  *Id.*  Plaintiff stated that during the day she did not have much to do, and that she just watched

_____

[8]  *See* TR 164. A list of medications Plaintiff filled at Kroger Pharmacy is also included in the record.  TR 384.

television and moved about. *Id*. Plaintiff testified that she needed a firm seat, that she could not sit for more than 30 minutes, and that she could not stand for more than 10 minutes. *Id*. She further reported that she thought that she could walk about 100 yards, that she could not lift or carry more than two pounds, and that it even hurt her to lift a gallon of milk. TR 576.

Plaintiff testified that she had met with a doctor in Chattanooga in November 1996 to undergo a court ordered examination. TR 576. Plaintiff explained that the doctor was initially unwilling to see her and that when he finally did so, he "was very rude and jerked [her] around." *Id*. Plaintiff reported that the doctor did not spend more than 10 minutes with her, that he "didn't listen to anything [she] told him," and that he "never examined [her] thoroughly at all." TR 576-77. Plaintiff explained that she soaked her diaper in the examining room when lifting her leg to get on the examining table, but that the doctor never gave her a minute to "get up slow." TR 577.

Plaintiff testified that her incontinence began the day after her back surgery, on the way home from the hospital. TR 577. Plaintiff stated that she experienced so much pain on the way home that she had to ask her husband to stop on the side of the road, and that when she stood up at that time, "it was a total gush; urine just flowed." TR 577-578. Plaintiff stated that she had never been able to control her urine since that time, that she had been seeing a physician regularly for that purpose, and that she was taking medication to remedy the problem. *Id*. Plaintiff testified that she had bowel and bladder trained herself to the extent that she could, and that this entailed going to the bathroom every two hours and regulating her intake of fluids. *Id*. According to Plaintiff, she could not vary her fluid intake and still remain on schedule. *Id*. Even with this schedule, Plaintiff reported that she would usually involuntarily wet herself and expel

25

feces once a week, and that her bowels would be incontinent if she had made a sudden movement, such as lifting her leg or taking a step. TR 578-579. Plaintiff said that she never knew when this was going to happen, and that she had no control over it. TR 579.

Plaintiff testified that her sons and husband had tried to assist her by fixing her bed on blocks so that it was easier to get in and out, and have "fixed everything to where [Plaintiff] don't [*sic*] have to bend .... [or] reach." TR 579. Plaintiff reported that she experienced pain in her back when she bent over, and that every movement she performed made her back hurt. TR 580. She stated that if she took pain medicine to relieve her pain, she would lose control over her bowels and bladder. *Id*. She further stated that she was unable to concentrate. *Id*. She added that she could not stoop, climb a ladder, load the dishwasher, arrange her groceries, lift the clothes in and out of the dryer, or get them out and fold them. *Id*. Plaintiff reported that her son was moving into a trailer across the road from her to help look after her. TR 581. She stated that she could bathe alone, but would not do so unless someone was in the house with her. *Id*. At the time of the hearing, Plaintiff stated that her husband and her children kept the house "straight" and reported that she had a friend who came in once a week to see if anything major needed to be done. *Id*.

Plaintiff reported that she was having pain in her hands and that, while this was, at times, the most painful part of her body, her back was generally the worst. TR 582. She added that there was scar tissue in her back and that she had spinal stenosis which caused her spine to pinch on her nerves every time she made a movement. *Id*. Plaintiff testified that she did not open pill bottles, that she could not do so if she needed to, and that her family put her pills in a little "flip-top thing" for her instead. *Id*.

Plaintiff testified that, at the time of the hearing, she had a "foot drop," and that she had gait trained herself not to limp because this caused her more pain. TR 583. She testified that her husband cut her hair short so that it would be easier to care for. *Id*. Plaintiff reported that she had an electric toothbrush and a push pump so that she did not need to squeeze the toothpaste. TR 583-584. According to Plaintiff's testimony, her son built her a handicap ramp so that she did not have to use stairs to get in or out of the house. TR 584. In addition, Plaintiff reported that her son prepared her food, and that he brought chicken patties, so that all she had to do was "just fix a sandwich or something." *Id*. Plaintiff added that she could not do anything with her hands; the heaviest thing she could pick up without complications was a book or a magazine. *Id*.

**b. Testimony of Mr. Jack Buckner, Plaintiff's Husband**

Plaintiff's husband, Jack Buckner, testified that Plaintiff "covered pretty much everything." TR 585. He added that Plaintiff was not able to do much at all and that her whole lifestyle had changed as a result. *Id*. He reported that Plaintiff used to work 60-80 hours per week as a nurse, and had a complete "turn around" after the back surgery when she was no longer able to work in that capacity. *Id*.

**c. Testimony of Dr. Gordon Doss, Vocational Expert**

Vocational Expert ("VE"), Dr. Gordon Doss, also testified at Plaintiff's hearing. TR 586-591. With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's past work as a licensed practical nurse was a skilled job that required medium physical exertion. TR 587.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff's and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in

27

the past.  TR 587.  The VE answered that a hypothetical claimant with a mild to moderate pain level; who could have a sit/stand option but would primarily like to be seated; and who could not bend, stoop, climb or do overhead work, but could engage in light work activity, would be able to work, *inter alia*, as a sales clerk or as a cashier at a light or sedentary level, and at an unskilled level or entry level.  TR 587.

The VE opined that, in the State of Tennessee, there were approximately 39,000 sales clerk or cashier jobs.  TR 587.  The VE noted that only about 25 percent of these jobs would allow a person to alternate between sitting and standing at will, meaning that there would be about 8,000 to 8,500 such jobs, all of which would be appropriate for the hypothetical claimant. *Id*.  If the hypothetical claimant were able to work at the sedentary level, the VE testified that there would be an additional 13,500 jobs.  TR 588.  He testified that, again, only about one quarter of those, about 4,000 to 4,500 jobs, would allow a person "a great deal of freedom" to alternate between sitting and standing.  *Id*.  In addition to the sales clerk and cashier positions, the VE testified that the hypothetical claimant could work as a receptionist in either a medical or some other setting.  TR 588.  The VE indicated that this job was sedentary and that, at the time of the hearing, there were about 2,842 such jobs in the state of Tennessee at the unskilled entry level.  *Id*.  He further reported that about three quarters of these receptionist jobs would be available to a person with a need to be able to sit or stand at will, leaving roughly 1,400 jobs available.  *Id*.

The VE reported that if the hypothetical claimant had to visit the bathroom an average of once every two hours, that would not impact that availability of either the cashier or receptionist positions because that is the frequency with which such workers are ordinarily given breaks.  TR

28

588.  The VE also stated that if the hypothetical claimant's pain level was "severe," such that it would prevent the individual from being able to concentrate on the task at hand, there would not be any work available for that claimant.  TR 588-589.  The VE noted that if the hypothetical claimant needed to use the restroom once an hour, this would impact the cashiering and sales clerk jobs, but not the receptionist-type work.  TR 589.  The VE confirmed that his proffered opinion also accounted for the hypothetical claimant's inability to bend, stoop, or reach, and the need to alternate between sitting and standing.  *Id.*

The VE indicated that the hypothetical claimant's inability to carry more than two pounds would prevent him/her from performing most jobs. TR 589.  The VE also testified that limitation in the use of one's hand could be a serious limitation, but that he needed information regarding the individual's particular strength in order to reach a conclusion about the individual's ability to perform certain tasks, such as the lifting entailed in cashier work.  TR 590.  The VE reported that if a person defecated or urinated on herself in the workplace on a regular basis, as many as four times a month, it would have an effect on the individual psychologically.  *Id.*  The VE stated that, if this psychological effect were significant, it would be difficult for the person to work, and would eliminate the above mentioned job options.  *Id.*

## 2  Testimony from Plaintiff's May 21, 1999 Hearing

### a.  Plaintiff's Testimony

At her second hearing, Plaintiff reported that she had become totally incontinent.  TR 549.  Plaintiff stated that her increased incontinence was a result of the Bumex she was taking for her foot and ankle swelling, that she had not been able to regain any bladder or bowel training, and that she now had to wear a diaper all the time.  *Id.*  Plaintiff stated that she did not

29

get signals to go to the bathroom, and that a sudden movement, such as stepping up, almost always caused an involuntary bowel movement. *Id*. Plaintiff stated that she knew when this had happened because, although she had no feeling in her pelvic area, she could feel the pressure in her buttocks, or smell the feces, which she attempted to mask with chlorophyll. TR 549-550.

Plaintiff explained to the ALJ that during the hearing she was experiencing pain in her legs, shoulders, back, hands, and over her left ear. TR 550. Plaintiff explained that she was wearing magnetized instruments on her hands to improve her circulation and to relieve stiffness, although it did not do much to alleviate her pain. TR 550-551. Plaintiff indicated that she had pain all the time, beginning when she woke up in the morning, and that she was hardly ever pain free, unless she took pain medication, which "knocked out any sensation." TR 551. Plaintiff reported that the pain started in her neck, would radiate down her back and shoulders, continue down her arm, and would sometimes settle in her elbow or her hands, and that she would have constant pain in her lower back. *Id*. Plaintiff additionally stated that she had pain in her right leg that radiated all the way down into her feet, and that she had constant pain in her lower back that she had experienced for years and that was getting worse all the time. *Id*. She stated that she had first noticed the pain in the late 1970's to early 1980's, which is when she first went to the doctor, who diagnosed her with osteoarthritis. *Id*.

Plaintiff reported that, in April 1995, the pain became so severe that she could hardly function. TR 551-552. It was at this time that Plaintiff discovered that she had ruptured a disc in her back. TR 552. Plaintiff stated that she took "every" pain medicine that was on the market and was determined not to be in a wheelchair in five years, as the doctor had predicted.[9] Plaintiff

---

[9] It is not clear from the testimony which doctor reportedly made this prediction or when it was made.

stated that, on a scale of one to ten, her pain was about a six all the time and would reach eight, nine or ten on occasion at which time she would take enough medicine to "get it knocked out." *Id.* Plaintiff stated that she took Darvocet when the pain was so intense that she could not rest or move. *Id.* Plaintiff stated that this occurred every time she was active, although she only needed the medicine every four hours if she avoided fatigue and tried to prevent flare-ups. *Id.* Plaintiff confirmed that she took Darvocet every day. TR 552-553.

Plaintiff reported that, besides taking her medication, she employed other methods to remain pain-free. TR 553. These included using magnetic insoles, sleeping on a magnetic pad, and using heat and cold.[10] *Id.* Plaintiff stated that she was also taking the anti-inflammatory medication Voltaren and medication for her leg cramps. *Id.* Plaintiff reported that she often had involuntary spasms of the leg if she was seated for too long, made a sudden movement or was exposed to the cold. TR 553-554. Plaintiff reported that her husband would massage her toes and apply a topical ointment to get them to "unlock." TR 554. Plaintiff stated that this happened every two or three days and did not follow a specific pattern. *Id.* She added that she would set a timer every 30 minutes and move around when the alarm sounded. TR 554-555. Plaintiff stated that her daily activities involved taking care of herself, and that she could not do anything in the way of housework. TR 555. During an average day, Plaintiff reported tending to her joints, reading, and watching television. *Id.* She stated that she frequently dropped things because her hands fell asleep, but that her friends and family were "arthritis friendly" and kept everything where it would be "safe" for her. TR 555-556. Plaintiff reported that her son would leave a thermos of coffee out for her so that she needed only to "lay her hands on it" to get the coffee.

---

[10] Plaintiff reported that she was using something which soothed and eased her stiffness, but the court reporter did not hear, and did not transcribe, what the instrument was. *See* TR 553.

31

*Id.*  Plaintiff also explained how her son and husband had built her a ramp to get into the house, had installed bars in the bathtub for support, and had removed the knobs from the pantry doors so that she would not have to turn them.  TR 556-557.

Plaintiff reported that she experienced side effects from the Nortriptyline and Zoloft she took, which left her groggy but dulled the pain.  TR 557; 384.  Plaintiff reported taking the Nortriptyline no more than once a day because it made her feel too groggy.  TR 557.   Plaintiff also stated that her son had made some efforts to find her work, but had not had any success since she has no computer skills and most people did not want to hire anyone who was incontinent.  TR 558.  Plaintiff stated that she had never done any work outside of the health care field.  *Id.*

In answer to questions posed by the ALJ, Plaintiff stated that Dr. Baker had placed on her Bumex in the later part of 1997.  TR 558-559.  She confirmed that she had been incontinent of both bowel and bladder since the day after her back surgery in 1995, that she had seen a urologist, and that she had been informed that nothing could be done about the problem.  TR 559.

**b.  Testimony of Ms. Gina Klaus, Vocational Expert**

Vocational Expert ("VE"), Gina Klaus, also testified at Plaintiff's hearing.  TR 560-565.  With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's work as a Licensed Practical Nurse was considered very heavy and semi-skilled.  TR 560.  She added that there were no transferable skills from this job to the light or sedentary category.  *Id.*  The VE stated that someone in Plaintiff's position who could lift 10-30 pounds occasionally, 10-20 pounds frequently, stand and walk two to four hours out of eight, half an hour to an hour at a

time, and sit four to six hours at a time, who could not balance, could occasionally climb, stoop, crouch and kneel, and who was limited in her ability to reach an increased range of motion, could perform a job which required a light level of exertion, such as a cashier. TR 560-61.

The VE opined that, in the State of Tennessee, there were approximately 20,000 cashier jobs that would be available for the hypothetical claimant. TR 561. The VE also stated that the job of security clerk would accommodate the hypothetical claimant, and that, in her estimation, there were approximately 6,000 of these jobs at the light level. *Id*. The VE further reported that the hypothetical claimant could work as a general office clerk, and that there were approximately 6,000 such jobs at the light level. *Id*. All of these jobs, according to the VE, allowed for a sit or stand option; none of them required any overhead work; and none would involve climbing anything beyond a flight of stairs, such as ladders, ropes or scaffolds. TR 562.

The VE stated that Plaintiff's need to change her diaper and the fact that sharp movements might cause her to be incontinent would not typically interfere with the performance of her job, although the employer would have to make certain accommodations. TR 562. The VE indicated that the jobs she had mentioned usually allowed for a 15 minute break in the morning and afternoon, and a 30 minute break for lunch. *Id*. Beyond this allotted time, the VE stated that the flexibility to take more breaks would depend on the employer and that there was more flexibility in the general clerk job than the cashier or security clerk positions. TR 563. The VE stated that, although a hypothetical person might be able to do the jobs she had mentioned, in light of Plaintiff's testimony about her exertional limitations, she would not be able to perform any of them. *Id*. The VE elaborated on the general clerk job, indicating that clerks are able to work independently, meaning that they could go to the restroom and take breaks. *Id*. She further

33

indicated that clerk positions were typically in an office setting, doing different filing or copying, not typing. *Id.* The VE testified that Plaintiff's incontinence would not interfere with her job performance if the odor could be controlled and did not interfere with others. *Id.* The VE reported that this would be an issue that would be dealt with between the employer and the employee, but that it could affect the performance of the employee's tasks. TR 564. The VE also testified that if the ALJ found Plaintiff's testimony fully credible, no jobs would exist for her. *Id.*

### 3  Testimony from Plaintiff's February 16, 2001 Hearing

**a. Plaintiff's Testimony**

In her third hearing, Plaintiff testified that since her last hearing, her physical condition had worsened, wearing her down mentally. TR 509. Plaintiff testified that she had previously undergone treatment for emotional problems in 1978 in North Carolina. *Id.* At that time, Plaintiff was hospitalized for three days and continued outpatient treatment for several months. *Id.* Plaintiff testified that, until recently, she had not received any other treatment for mental health problems. TR 510. Plaintiff reported that her emotional upset stemmed from her incontinence. *Id.* She reported that she did not have any feeling in her entire perinea area, she had neither sexual, bladder, nor bowel feelings. *Id.* Plaintiff reported that she was still wearing diapers and had not gone without them since 1995. *Id.* Plaintiff further stated that she usually had an involuntary bladder "spill over" every day and that she still had bowel movements without notice, especially when upset or nervous. TR 511-512. Though she reported trying to have a bowel movement for several hours every day, she had not been able to establish a "good routine" since 1996. TR 512. Plaintiff stated that she had not had any accidents in public

34

recently because the only time she had left the house since November 2000 was to go to the doctor. TR 513. Plaintiff stated that the spasms were getting worse than they were in 1995 and 1996, and that unless she took her medicine, she stayed constantly wet enough to cause irritation. *Id.* Plaintiff reported that she was put on Bumex to alleviate her feet and ankle swelling, but that this was a diuretic and was aggravating her incontinence so that, in helping one problem, she was creating another. TR 513-514. Plaintiff explained that when she would take a step up her bowels would void. TR 514. Plaintiff reported getting leg cramps upon kneeling or bending and experiencing pain if she tried to lift something. *Id.* Plaintiff added that she did not lift things from the refrigerator. *Id.*

Plaintiff reported that she continued to experience leg and foot cramps that she described in her last hearing. TR 515-516. Plaintiff stated that it took five to ten minutes for her husband to "unlock" her toes, that the cramps usually happened at night, and that there was no way to predict when the cramps would hit. TR 516. She also stated that the cramping was very painful. TR 517.

Plaintiff reported that she had a lot of pain in other areas of her body, mainly her neck. TR 517. Plaintiff also stated that she had an enlarged collar bone which restricted her range of motion. *Id.* She reported stiffness and numbness in her joints that prevented her from continuing to crochet or sew. TR 517-518. Plaintiff explained that she had had an MRI to check for carpel tunnel, but that the doctor determined that the numbness in her fingers was in fact caused by the bulging disc in her neck. TR 518. Plaintiff reported dropping things that she tried to hold, ranging from cups to her grandson. *Id.* Plaintiff reported that she was taking 2,400 mg of Neurontin per day for chronic pain and depression, and that it was helping. TR 519; 384. She

35

gauged her pain as a seven on a scale of one to ten.   TR 520.

Plaintiff described an incident that she had in early 2000 when she stopped in the Dollar General store and urinated all over herself on the way to Dr. Baker's office.  TR 520.  Plaintiff reported being so embarrassed that she could not stand it, so she left and went to Dr. Baker's office, who sent her to the Emergency Room because she had written a suicide note of sorts.  TR 520-521.  Plaintiff then went to University Medical Center/McFarland where she stayed for a week.  TR 520.  Plaintiff reported that later in the year she went to Centennial Medical Center, where the doctors reportedly "don't [sic] treat you like a human," to get her Neurontin adjusted. TR 522.

Plaintiff confirmed that she had continued to see Dr. Baker since 1995, and that she used to work with him as an LPN, a job which she loved.  TR 522-523.  Plaintiff reported that she took all the various medications that Dr. Baker had prescribed to her.  TR 523.  Plaintiff reported that Zoloft helped her anxiety and depression the most.  TR 524.  When asked about the pain around her left ear, Plaintiff reported that it was from her neck, and that she was still using magnets to try to alleviate her pain.  TR 524-525.  Plaintiff reported having had some side effects with medications she was no longer using, but that she was doing well on her then-current medications.  TR 525.

Plaintiff stated that she did not feel able to do any work of any kind that would "do anybody justice."  TR 525-526.  She stated that she could lift five to ten pounds if she had the right angle, but that her real trouble was with bending to unload the dishwasher, for example.  TR 526.  Plaintiff explained that her house had been changed to accommodate her condition, including adding a handicap ramp, installing rods in the shower, and fixing her toothpaste so that

36

she did not have to squeeze it.  TR 526; 528.  Plaintiff reported that her son and daughter-in-law had moved to keep her company because she was so lonely.  TR 527.  Plaintiff also stated that she could attend to her personal hygiene, but that she did not dare take a shower without somebody present in the house.  TR 527-529.  Plaintiff stated that she had been reading and watching television to pass time, and that she could read with the aid of her glasses and large print.  TR 529-530.  Plaintiff stated that she had friends who tried to come by once a week to help her.  TR 530.

Plaintiff testified that she had been advised that surgery might help her collarbone, but that she was too afraid of having surgery or having needles close to her neck.  TR 530.  She also stated that she had a goiter, but that she was taking medicine to keep it from growing.  *Id*.  She testified that she could neither stand nor sit comfortably, and that doing either for 15 minutes resulted in pain in her back and hips.  TR 531.  She stated that Dr. Geer had advised her that he could operate on her bowels and bladder, but that he could not guarantee any result, and that it might not be worth the pain and spasms.  *Id*.  She stated that the doctor had informed her that there was a means to plug the urethra to prevent accidents, but that it was only very temporary, for special occasions, and was unhealthy.  *Id*.

Plaintiff testified that her pain was unbearable and that she usually had to get up once or twice in the night to take medicine, in addition to her normal medications.  TR 532-533.  Plaintiff reported that she was in pain even before she left work and did not know how long it had been since she was pain free.  TR 533.  Plaintiff could not identify the primary source of her pain, as she stated that she had pain all over.  *Id*.  She reported that the pain interfered with her thinking, and that on some days all she wanted was peace and quiet and the drapes closed.  TR

37

534.  She stated that there were days when she could not do anything, and that this sometimes happened more than once a week.  *Id.*  Plaintiff stated that she did not want to hurt herself, but that she just wanted help.  TR 535.  She added that she was doing better when she was in group therapy, that she could not then-currently attend because she had a pin in her toe, but that she would return as soon as the pin was removed the following Wednesday.  *Id.*   Plaintiff testified that she had been going to group therapy since February 2000.  TR 535-536.

**b.  Testimony of Mr. Jack Buckner, Plaintiff's Husband**

Plaintiff's husband, Jack Buckner, stated that, to the best of his knowledge, Plaintiff's testimony was true.  TR 536.  He reported that he had been married to Plaintiff for 30 years and that he had never previously seen her in the condition in which she then found herself.  TR 536-537.  He also testified that Plaintiff had been depressed since 1995.  *Id.*  Mr. Buckner testified that he did not think that Plaintiff was capable of doing anything more physically beyond what she had reported being able to do.  TR 537.

**c.  Testimony of Ms. Lisa Courtney, Vocational Expert**

Vocational Expert ("VE"), Lisa Courtney, also testified at Plaintiff's hearing.  TR 538-543.  With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's past work as a Licensed Practical Nurse was medium, rather than very heavy (as characterized in the previous hearing), semi-skilled, and included no transferable skills.  TR 538.  The VE also testified that, in light of Plaintiff's residual functional capacity of needing a sit/stand option, and her ability to occasionally climb, stoop, crouch, and kneel, and not to balance, reach, or work at heights or around moving machinery, she agreed with the past VE testimony that the jobs available to Plaintiff were cashier, security guard, or clerk, and that for these positions, there

were 20,000, 6,000, and 6,000 available positions, respectively.  *Id*.  The VE noted, however, that, in her opinion, sales clerk and cashier positions did not usually have a sit/stand option.  *Id*.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff's, where the individual had a GAF in the 51 to 55 range and asked if the jobs of cashier, security guard or clerk would still be available.  TR 539.   The VE answered that the she did not know about the security jobs, but that the cashier and sales clerk jobs were semi-skilled jobs, and that she believed unskilled jobs would be more appropriate for someone with a GAF of 55.  TR 538-539.  The VE stated that there would be jobs for such an individual.  TR 539.   The VE opined that in the State of Tennessee, there were approximately 700 inventory jobs which would be appropriate for the hypothetical claimant and which would entail such activities as marking, tagging and color coding.  *Id*.  In addition, there would be some hand packing jobs, with a sit or stand option at a table or a bench.  *Id*.  The VE testified that there would be about 5,000 of these hand packing jobs available for the hypothetical claimant.  TR 540.[11]  The VE further added that there were about 700 to 800 tin packer jobs that would accommodate someone who had to stand up and sit down as needed.  *Id.*  The VE testified that these inventory, hand packing, and tin packing jobs would accommodate a person's need to change or replace diapers or pads during the morning, afternoon, and lunch breaks, but that more trips to the bathroom would be frowned upon, and, over time, would probably create difficulties in maintaining a job.  *Id*.  The VE explained that these jobs did not have strict production rates, but that a "certain amount" was nevertheless required.  TR 540-541.

---

[11]  The VE mentioned another job, of which there would be about 2,500 which were "not on the receiving line", but the court reporter was unable to record the type of job as the VE was speaking inaudibly.

The VE testified that someone with a GAF score between 20 (where there was a danger of hurting oneself) and 50 would not be able to perform any of the identified jobs. TR 541. The VE further opined that someone with a GAF of 60 could perform slightly more skilled jobs, and could meet the mental demands of an SVP of three. TR 541-42. The VE added that, based on Plaintiff's testimony, she would not be capable of sustaining work at any level of exertion. TR 542. The VE further stated that, if Plaintiff had to take a two hour bathroom break once a week, that would not be permitted on a job site. *Id.* She further added that, if the ALJ found Plaintiff's testimony fully credible, there would not be any jobs available to her. TR 543.

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

40

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

Plaintiff carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

41

At the administrative level of review, Plaintiff's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[12] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if Plaintiff is not significantly limited by a nonexertional impairment, and then only when Plaintiff's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*

_____

[12]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

In such cases where the grid does not direct a conclusion as to Plaintiff's disability, the Commissioner must rebut Plaintiff's *prima facie* case by coming forward with particularized proof of Plaintiff's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all Plaintiff's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that (1) the ALJ failed to comply with the October 19, 2000 Order of the Appeals Council; (2) the ALJs' finding that Plaintiff retained the residual functional capacity to perform a range of light work was not based upon substantial evidence; (3) the medical-vocational guidelines cannot be used to find that Plaintiff is disabled when nonexertional impairments are present; (4) the ALJ's determination regarding Plaintiff's subjective complaints of pain and discomfort were not based upon substantial evidence; (5) the ALJ's failure to consider records after the expiration of insured status was an error that prevents the unfavorable decision from being supported by substantial evidence; (6) the ALJ's failure to assess Plaintiff's limitations regarding her bladder and bowel problems prevents his unfavorable decision from being supported by substantial evidence; and (7) the VE's testimony did not constitute substantial evidence that Plaintiff was capable of sustaining work at any level of exertion. Docket Entry No. 10. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the

Case 2:02-cv-00103   Document 16   Filed 02/02/06   Page 43 of 63 PageID #: 43

Commissioner's decision should be reversed or remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. October 19, 2000 Order of the Appeals Council**

Plaintiff contends that the ALJ failed to comply with the October 19, 2000 Order of the Appeals Council.[13] Docket Entry No. 10. Specifically, Plaintiff claims that the ALJ failed to

---

[13] The October 19, 2000 Order or the Appeals Council states in relevant part that, upon remand, the ALJ should

> "Give further consideration to claimant's maximum residual functional capacity and provide appropriate rationale with specific reference to evidence of record in support of the assessed limitations."

and

> "Evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a to document application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c)."

20 CFR 404.1520a(c) states in pertinent part:

44

evaluate her residual functional capacity in terms of both her mental and physical impairments according to these regulations and rulings.  *Id.*  Plaintiff asserts that the ALJ's decision is thus an error of law and is not based on substantial evidence.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion" (*Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401)), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  (*Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229)).

In evaluating Plaintiff's physical residual functional capacity after the October 19, 2000 Order of the Appeals Council, the ALJ referenced his prior decision[14] because he noted that the Appeals Council had not questioned the physical residual functional capacity he previously

---

"(1)[...] we will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) [...] we will consider such factors as the quality and level of your overall functional performance ...

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation ...

(4) When we use the rate of degree of limitation in the first three functional areas [...] we will use the following five point scale: None, mild, moderate, marked and extreme. When we rate the degree of limitation in the fourth functional area [...] we will use the following four-point scale: None, one or two, three, four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."

[14] ALJ Garner also presided over Plaintiff's May 21, 1999 hearing.  *See* TR 545-565.

45

found. TR 18. In his previous decision, the ALJ had considered a wide range of evidence to determine Plaintiff's physical residual functional capacity. TR 310-317. The ALJ noted that Plaintiff had originally alleged disability due to back problems, a mass in her pelvis, hydronephrosis of the right kidney, and arthritis. TR 311. He noted that Plaintiff was then status post-hysterectomy and laminectomy, had osteoarthritis of the hands and shoulders with subluxation of the right "AC" joint, and that she had no new impairments that had not been covered in the disability determination performed by Dr. Seiters. TR 314-315. As to Plaintiff's incontinence, the ALJ considered that a treating physician prescribed medication for incontinence after surgery in 1995, with instructions to return as needed. TR 315. The ALJ noted that Plaintiff did not return for any further treatment of this problem. *Id*. The ALJ further considered Dr. Seiters' Medical Source Statement with regard to Plaintiff's ability to perform work-related physical activities indicating that Plaintiff could lift/carry 20 to 30 pounds occasionally, 10 to 20 pounds frequently, stand/walk two to four hours in an eight hour workday in one-half hour intervals, sit four to six hours in two hour intervals, occasionally climb stoop, crouch, and kneel, never engage in balancing or reaching overhead, and could not work at heights, or with/around moving machinery. TR 312. After considering the evidence, the ALJ found that Plaintiff retained the residual functional capacity for light work, with a sit/stand option, occasional climbing, stooping, crouching, and kneeling, no balancing, no reaching overhead, and no working at heights or with/around moving machinery. *Id*.

As for Plaintiff's mental residual functional capacity, the ALJ concluded that Plaintiff had no more than moderate limitations in mental functioning which he stated permitted at least unskilled work activity. TR 18. The ALJ noted that, in a September 16, 1996 report, Plaintiff's

46

primary care physician, Dr. Baker, stated that Plaintiff's depression was controlled with Zoloft. *Id*. He further noted that Plaintiff was hospitalized for one week at McFarland Hospital with a GAF of 20 on admission, that Plaintiff had improved to 50 on discharge, and that Plaintiff's highest GAF in the past year had been estimated at 60. *Id*. He also considered that Plaintiff's GAF's were generally above 50, although she was at 50 two months post hospitalization at McFarland Hospital. *Id*. The ALJ also noted that Plaintiff's therapist, Carole Lovell, consistently rated her limitations as moderate with a GAF of 55. *Id*. The ALJ stressed that Plaintiff's GAF in the year leading up to the decision was generally at 60, which allowed Plaintiff to perform the jobs identified by the Vocational Experts. *Id*.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence"; the ALJ's decision, therefore, must stand.

## 2. Residual Functional Capacity

Plaintiff maintains that the ALJ's finding that Plaintiff retained the residual functional capacity to perform a range of light work is not based upon substantial evidence. Docket Entry No. 10.

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00©. With regard to the evaluation of physical

47

abilities in determining a Plaintiff's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature
> and extent of your physical limitations and then determine your
> residual functional capacity for work activity on a regular and
> continuing basis. A limited ability to perform certain physical
> demands of work activity, such as sitting, standing, walking,
> lifting, carrying, pushing, pulling, or other physical functions
> (including manipulative or postural functions, such as reaching,
> handling, stooping or crouching), may reduce your ability to do
> past work and other work.

20 C.F.R. § 404.1545(b).

Plaintiff argues that she cannot be considered to do a wide range of light work activity

unless she can perform a wide range of both sedentary and light work. Docket Entry, No. 10,

*citing Duncan v. Secretary of H.H.S.*, 778, F.2d 279, 282 (6th Cir. 1985). Plaintiff also asserts

that sedentary work requires the ability to sit for extended periods and is precluded by an

impairment which requires a plaintiff to alternate sitting and standing. Docket Entry, No. 10,

*citing Preston v. Secretary of H.H.S.*, 854 F.2d 815, 819 (6th Cir. 1998)l; *Howse v. Heckler*, 782

F.2d 626, 628 (6th Cir. 1986); *Wages v. Secretary of H.H.S.*, 755 F.2d 495, 498 (6th Cir. 1985).

Each of the ALJ's, in the case at bar, after evaluating all of the objective medical

evidence of record and Plaintiff's level of activity, determined after each hearing that Plaintiff

retained the Residual Functional Capacity to perform light work. TR 19, 218, 316.

In the first decision, the ALJ specifically considered Plaintiff's abdominal surgery, which

was considered without difficulty or complications, and her back surgery, which she tolerated

well. TR 213. The ALJ also considered Plaintiff's incontinence which developed after her

surgery, and noted that Plaintiff reported to Dr. Schooley that this problem was getting better and

that the pain in her leg was better post-operatively. *Id.* The ALJ noted that Plaintiff was

prescribed medication to fight her incontinence and that it appeared to be working well.  TR 214.

The ALJ also considered follow-up notes from Dr. Baker, who recorded that Plaintiff had stated

that she was feeling better.  *Id*.  Moreover, the ALJ considered Plaintiff's consultative medical

examination by Dr. Seiters, which indicated, among other things, that Plaintiff could lift as much

as 20 to 30 pounds, stand and/or walk two to four hours in an eight hour work day with a two

hour interruption, occasionally climb, stoop, crouch, and kneel, but that she could never balance,

and that she had no physical limitations with respect to handling, feeling, pushing or pulling,

although she would have difficulty reaching.  *Id*.  The ALJ noted that light work involves lifting

no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10

pounds, and that sedentary work involves lifting no more than 10 pounds, with occasional

carrying of object weighing 5 pounds or less.  TR 215; 20 C.F.R. § 404.1567.  The ALJ

concluded that the range of lifting that Plaintiff could accomplish was well within the definitions

of "light" and "sedentary" work.  TR 215.

   In the second decision, the ALJ noted that Plaintiff had originally alleged disability due

to back problems, a mass in her pelvis, hydronephrosis of the right kidney, and arthritis.  TR 311.

He noted that Plaintiff was then "status post-hysterectomy and laminectomy," had "osteoarthritis

of the hands and shoulders with subluxation of the right AC joint," and had no new impairment

that was not adequately covered by the consultative examination by Dr. Seiters.  TR 314-15.  As

to Plaintiff's incontinence, the ALJ considered that a treating physician prescribed medication

for incontinence after surgery in 1995, with instructions to return as needed, and that Plaintiff did

not return for any further treatment of this problem.  *Id*.  The ALJ further considered Dr. Seiters'

assessment of Plaintiff's ability to perform work-related physical activities indicating that

Plaintiff could lift/carry 20 to 30 pounds occasionally, 10 to 20 pounds frequently, stand/walk two to four hours in an eight hour workday in half-hour intervals, sit four to six hours in two hour intervals, occasionally engage in climbing, stooping, crouching, and kneeling, but no balancing, no reaching overhead, and no working at heights, or with/around moving machinery. TR 312. The ALJ found that Plaintiff retained the residual functional capacity for light work, with a sit/stand option, occasional climbing, stooping, crouching, and kneeling, no balancing, no reaching overhead, and no working at heights or with/around moving machinery. TR 315.

In the third decision, the ALJ reiterated what he had said in the second hearing with regard to Plaintiff's physical residual functional capacity. TR 18.

The ALJs properly evaluated the evidence in reaching their Residual Functional Capacity determinations, and the Regulations do not require more. Plaintiff disputes that the ALJs' finding that she is capable of performing light work is supported by substantial evidence. Docket Entry No. 10. As has been discussed above, however, there is substantial evidence supporting the ALJs' finding. Because there is substantial evidence in the record to support the ALJ's Residual Functional Capacity determination, the ALJ's determination must stand.

**3. Application of the Grid Rules**

Citing *Abbott v. Sullivan,* Plaintiff argues that the ALJ's reliance on the grid at step five of the sequential evaluation process is erroneous because the grid rules consider only exertional or strength limitations and generally cannot be applied in the presence of significant nonexertional limitations such as mental, manipulative, or environmental limitations. Docket Entry No. 10, *citing* 905 F.2d 918, 926 (6th Cir. 1990). Although Plaintiff correctly asserts that the ALJ cannot blindly apply the grid rules when the Plaintiff is significantly limited by

50

nonexertional limitations, Plaintiff fails to show either that she is "significantly limited" by her nonexertional limitations, or that the ALJ blindly applied and relied upon the grid rules.

As explained above, the Commissioner has the burden at step five of establishing Plaintiff's ability to work by proving the existence of a significant number of jobs in the national economy that Plaintiff could perform, given his or her age, experience, education, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920. *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations, or environmental limitations. *Abbot*, 905 F.2d at 926.

Plaintiff contends that she suffers from nonexertional impairments, specifically mental limitations from her depression, and that, accordingly, the ALJ's reliance on the grid rules was improper. The mere presence of a mental impairment, however, does not preclude reliance upon the grid rules unless the mental impairment results in functional limitations that significantly limit Plaintiff's ability to work at a particular exertional level. *See, e.g., Moon*, 923 F.2d at 1182; *Buress v. Secretary*, 835 F.2d 139, 142-43 (6th Cir. 1987).

The medical record in the case at bar contains clinical findings, laboratory test results, physician reports, diagnoses, assessments, and prognoses that do not indicate that Plaintiff suffers from mental limitations or other nonexertional impairments that significantly affect her ability to perform work at a particular exertional level. For instance, the ALJ considered medical records from the Personal Growth and Learning Center which diagnosed Plaintiff as having major, recurrent and severe depression (TR 16), however, the ALJ also considered treatment

51

records from the Personal Growth and Learning Center which showed that Plaintiff, on March 28, 2000, had a GAF score of 55, and that her highest GAF in the previous year was 60. *Id.* The ALJ also noted that Plaintiff had a GAF of 20 when admitted to McFarland Hospital, but that her GAF had improved to 50 upon discharge, and that her highest GAF in the prior year was estimated at 60. TR 18. Moreover, the ALJ considered additional evidence from Dr. Hudak which said that Plaintiff's GAFs were generally above 50, as well as evidence from Plaintiff's therapist Carole Lovell, who saw Plaintiff regularly and who consistently rated Plaintiff's limitations at moderate with a GAF of 55. *Id.* The ALJ noted that Plaintiff's GAFs in the year leading up to his decision were generally at 60, which meant that Plaintiff was eligible to perform the jobs identified as available by the Vocational Experts. *Id.* The ALJ also considered records, dated January 19, 2001, from the Personal Growth and Learning Center, which assigned Plaintiff a GAF of 50 to 55 and which indicated that her best GAF in the last year was "probably much higher." TR 17. The ALJ considered the VE's testimony that the jobs she recommended for Plaintiff remained available when factoring in a GAF of 55 to 60. TR 18. In the absence of medical evidence that Plaintiff has a mental impairment that prevents her from performing the work proposed by the VEs, medical records which indicate her GAF is at least between 50 and 60 do not preclude application of the grid rules.

The ALJ properly evaluated the evidence at step five to establish Plaintiff's ability to work. The ALJ's decision, therefore, must stand.

## 4. Subjective Complaints of Pain

Plaintiff essentially contends that in finding that her subjective complaints were not fully credible, the ALJ did not appropriately address her complaints of pain, and that his determination

was not supported by substantial evidence. Docket Entry No. 10.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.") Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the

evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJs found that Plaintiff's subjective complaints of pain and discomfort did not give rise to all the symptoms and limitations alleged. TR 18-19; 215-216; 315-316. In the first hearing, the ALJ gave "careful consideration to all avenues presented that relate to such matters as daily activities; location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage effectiveness, and side effects of any medications taken for pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms, and other factors concerning the functional limitations and restrictions due to pain or other symptoms." TR 215. Specifically, the ALJ noted that Plaintiff had experienced gynecological problems which required her to have a total abdominal hysterectomy and bilateral salpingo oophorectomy in August 1995, but that the objective evidence showed that Plaintiff made a satisfactory recovery from this procedure without complications. *Id*. Likewise, the ALJ noted that, with respect to Plaintiff's back problems, she reportedly had less pain in her leg after her semi-hemilaminectomy and diskectomy at L5-S1 than she had pre-operatively. TR 216. The ALJ also considered that Plaintiff's incontinence was responding well to medication. *Id*.

The second ALJ made a similar determination in his unfavorable decision. TR 315. That ALJ evaluated Plaintiff's subjective complaints, including pain, and found that she had not

experienced any pain or other symptomatology of a disabling level of severity on an ongoing basis.  *Id*.  He added that there were no diagnostic studies or test results to establish the level of severe, disabling pain as alleged by Plaintiff.  *Id*.  The ALJ noted that Plaintiff had complained of urinary incontinence in 1995 to a consultative physician who told her to return as needed, but that she never did so.  *Id*.  He further noted that Plaintiff stated that she woke up with pain and hurt constantly.  *Id*.  The ALJ specifically noted that Plaintiff stated that she had pain in her neck, both shoulders, over the left ear, hands, and feet.  TR 314.  He also discounted her activities, noting that Plaintiff stated that she could take care of her own personal needs, but did not do any housework, and that during the day she read and watched television, but that, although her son had given her one, she could not use a computer because it was too painful.  *Id*. He noted that Plaintiff had reported that she was constantly in pain, but that she was taking Darvocet for the pain, as well as an anti-inflammatory pill, and that, other than feeling groggy, she experienced no side effects from her pain.  TR 315.  He noted that Plaintiff reported further treating her pain with paraffin treatments, hot/cold treatment, rest, and magnetic balls in her hands to help relieve her pain and stiffness, and that, other than this, she did not report using any other method or device to relieve her pain.  TR 315-316.  The ALJ also noted that Plaintiff could care for her personal needs without assistance.  TR 316.  The ALJ confirmed this analysis in the third unfavorable decision.  TR18.

     As can be seen, the ALJs' decisions specifically address in great detail not only the medical evidence, but also Plaintiff's testimony and her subjective claims, clearly indicating that these factors were considered.  TR 18; 215; 315.  The ALJs' decisions properly discuss Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the

precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. § 404.1529(c)(2)). It is clear from the ALJ's detailed, articulated rationales that, although there is evidence which could support Plaintiff's claims, the ALJ's chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the ALJ's province.

Moreover, the ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all the objective medical evidence, each ALJ determined that Plaintiff's subjective complaints of pain and discomfort did not give rise to all the symptoms and limitations alleged. TR 18-19; 215-216; 315-316. As has been noted, this determination is within the ALJ's province. Additionally, the ALJ's in the case at bar clearly stated the evidence

upon which they based their decision.

The ALJs observed Plaintiff during her hearings, assessed the medical records, and reached a reasoned decision; as discussed above, the ALJs' findings are supported by substantial evidence and their decisions not to accord full credibility to Plaintiff's allegations were proper. Therefore, this claim fails.

**5.  Consideration of Records From the Period After Plaintiff's Insured Status Expired**

Plaintiff contends that the ALJ did not consider medical records dated after the expiration of her insured status.  Docket Entry No. 10.  Plaintiff asserts that, "the complaints of depression, urinary incontinence, leg and back pain are not addressed [in the ALJ's decision] pursuant to any of the applicable regulations and rulings."  *Id.*  Plaintiff argues that, pursuant to the Sixth Circuit, "the Secretary must consider medical evidence of a Plaintiff's condition after his date last insured to the extent that the evidence is relevant to Plaintiff's condition prior to the date last insured."  *Id*.  Plaintiff argues that the evidence of record from after Plaintiff's date of last insured is relevant to Plaintiff's condition prior to the date last insured, and therefore should have been considered by the ALJ.  *Id.*

Plaintiff is correct that the ALJ "must consider the medical evidence of a Plaintiff's condition after the date of his last insured to the extent that the evidence is relevant to Plaintiff's condition prior to the date last insured," but Plaintiff has failed to demonstrate that the ALJ did not do so.  In fact, the ALJ, in his decision, specifically discussed the relevant evidence and testimony in depth, including evidence relating to Plaintiff's depression, incontinence, and leg and back pain from after her date last insured.  TR 14-20.  The ALJ discussed, *inter alia*, Dr. Baker's December 5, 2000, opinion that Plaintiff was "totally disabled due to her urinary

57

incontinence and depression."[15] TR 17. The ALJ also considered records from the Personal Growth and Learning Center, specifically noting, *inter alia*, that a January 19, 2001, mental status examination revealed Plaintiff as anxious and in a depressed mood, and that the diagnosis was "major depression, severe, without psychotic features, generalized anxiety disorder, and a somatization disorder not otherwise specified." *Id.* Moreover, the ALJ discussed a February 20, 2001, progress note from the Personal Growth and Learning Center which indicated that Plaintiff had reported that she had relapsed into depression after recent foot surgery. *Id.* The ALJ further acknowledged that Plaintiff had continued to complain of "neck, back, shoulder, feet, legs, arm, elbow, and wrist pain, pain in her collar bone, headache, toothache, earache, bladder and bowel incontinence, and depression." TR 18.

Although the aforementioned records support Plaintiff's allegations of disability, the record contains evidence which does not support her allegations, and that evidence was also discussed by the ALJ. TR 14-20. The ALJ discussed, *inter alia*, that a December 12, 2000, group note from the Personal Growth and Learning Center indicated that Plaintiff's mental status was "appropriate and within normal limits." TR 17. The ALJ noted that Plaintiff's January 19, 2001, mental status evaluation revealed that her memory, insight, and judgment were "adequate for daily living." *Id.* He also noted Plaintiff's statement that "she felt that she had the skills to cope and endure." *Id.*

The ALJ further stated:

> By June 20, 2000 [Dr. Baker] noted improved concentration and

_____

[15]After discussing Dr. Baker's December 5, 2000, report, the ALJ concluded that Dr. Baker's statement of Plaintiff's total disability was not supported by the objective medical evidence of record and was therefore not credible. *See* TR 19.

58

> depression.  Therapist Lovell, who sees [Plaintiff] regularly,
> consistently rates her limitations at moderate with a GAF of 55.
> Of particular note is that past year GAF's are generally at 60 which
> allows the jobs as previously identified by VE Gina Klaus and
> concurred with by VE Lisa Courtney.

TR 18.

After considering the record as a whole, including the evidence from after the date Plaintiff was last insured, the ALJ did not find Plaintiff's "complaints to be persuasive to the extent alleged," and while the ALJ decided to accord the medical assessments by the state agency physicians "some credit in view of the fact that their assessments appear to be consistent with the objective medical evidence of record," he decided to "not credit the statement of disability by Dr. Baker" because he determined that it was "not supported by the objective medical evidence of record."  TR 19.

Although Plaintiff is correct that the evidence submitted from after Plaintiff's date of last insured is relevant to the impairments established prior to her date last insured and therefore must be considered by the ALJ, the ALJ's detailed, articulated decision clearly demonstrates that he considered this evidence and decided which evidence to accord credibility.  The ALJ specifically discussed Plaintiff's evidence from after her date of last insured and determined the extent to which he accorded that evidence credibility; the ALJ's decision was properly supported by "substantial evidence"; and the ALJ's decision must stand.

## 6.  Consideration of Plaintiff's Incontinence

Plaintiff contends that the ALJs failed to assess Plaintiff's limitations with regard to her bowel and bladder problems and that their unfavorable decisions were therefore unsupported by substantial evidence.  Docket Entry No. 10.

In Plaintiff's first unfavorable decision, the ALJ considered the evidence that Plaintiff's incontinence developed after her back surgery, on the way home from the hospital. TR 213. The ALJ noted that Plaintiff had been incontinent on two previous occasions, once during pregnancy and once again when she had kidney stones. *Id*. A Magnetic Resonance Imaging Scan of Plaintiff's spine performed by Dr. Schooley did not reveal any compressive lesion that would cause incontinence, and Plaintiff reported to the doctor that the problem was getting better. *Id*. The ALJ also considered that a further evaluation of Plaintiff's urinary incontinence in the form of a renal ultrasound was interpreted as normal. TR 214. The ALJ also noted that Plaintiff's urinary incontinence responded well to Oxybutynin. TR 216.

In Plaintiff's second unfavorable decision, the ALJ noted that the medical evidence of record failed to document any continuing complaints or treatment for incontinence. TR 311. The ALJ considered that Plaintiff saw Dr. Moore right after surgery in 1995 and that he treated her incontinence with prescription medication with good response, and that, although she was told to return if she had any problems, Plaintiff never did so. *Id*. The ALJ noted that, at the consultative examination, Plaintiff confirmed that the incontinence had been a post-operative complication, but did not allege continuing problems. *Id*. The ALJ concluded that her urinary incontinence did not persist more than 12 months past the October 1995 surgery and stated that he found her testimony regarding incontinence was not fully credible and was not supported by the objective medical evidence of record. *Id*. Consequently, the ALJ found that Plaintiff's incontinence did not constitute a medically determinable impairment, and created no work-related restrictions. *Id*.

In the third unfavorable opinion, the ALJ considered that Plaintiff went to Dr. Geer, on a

referral from Dr. Baker, to deal with a long history of urinary incontinence and bladder spasms. TR 16. He noted that the examination of Plaintiff's abdomen was unremarkable, and that the examination of her pelvis revealed a "Grade II cystocele" and "Grade I-II rectocele." *Id*. He also noted that, on "urodynamic testing," Plaintiff was able to hold "fairly large amounts of fluid." *Id*. In addition, he considered that the impression was "stress urinary incontinence" with "a small component of neurogenic bladder and a paravaginal defect" that would be amenable to surgery. *Id*. The ALJ considered the evidence in its entirety, including the evidence dealing with bladder and bowel incontinence, and stated that he did not find Plaintiff's complaints to be persuasive to the extent alleged. TR 19.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences (*Garner*, 745 F.2d at 387) even if the evidence could also support a different conclusion (*Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273)). The ALJ's decision was properly supported by "substantial evidence"; the ALJ's decision, therefore, must stand.

## 7. The Hypothetical Posed and the Vocational Expert's Testimony

Plaintiff essentially contends that the Vocational Expert's testimony in the third hearing did not constitute substantial evidence that Plaintiff was capable of sustaining work at any level of exertion. Docket Entry No. 10. Plaintiff asserts that the ALJ's hypothetical questioning of the Vocational Expert failed to describe fully and precisely Plaintiff's impairments. *Id*. Plaintiff cites *Pratt v. Sullivan* to support her contention that if the ALJ's question to a VE fails to include "with precision" all the impairments from which Plaintiff suffers, then the VE's testimony cannot constitute substantial evidence upon which the ALJ can base his conclusion that Plaintiff

61

was not entitled to benefits.  956 F.2d 830 (1992).

Despite Plaintiff's assertions, however,  "it is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."  *Casey v. Secretary*, 987 F.2d 1230, 1235 (6th Cir. 1993).  As discussed above, the ALJ did not believe that Plaintiff's evidence regarding her incontinence was fully credible and he therefore was not required to incorporate this limitation in his hypothetical.[16]

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED and Defendant's Motion for Judgment on the Administrative Record be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

---

[16]  Although the ALJ did not question the VE in great depth about the effect of Plaintiff's incontinence, the ALJ did question the VE about bathroom breaks on the job.  TR 540-541.

E. CLIFTON KNOWLES
United States Magistrate Judge

63